RECEIVED

USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK

DATE  5 / 23 / 12

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | |
|---|---|
| MERVIN ROY,<br>     Appellant | CIVIL ACTION<br>NO. 2:11-CV-01594 |
| VERSUS | |
| U.S. COMMISSIONER OF SOCIAL<br>SECURITY,<br>     Appellee | JUDGE JAMES T. TRIMBLE<br>MAGISTRATE JUDGE JAMES D. KIRK |

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Mervin Roy ("Roy") filed an application for supplemental security income ("SSI") on September 26, 2003, alleging a disability onset date of August 1, 1991 (Tr. p. 88) due to seizures and a crooked back (Tr. p. 104). That application was denied by the Social Security Administration ("SSA") both initially and on reconsideration (Tr. pp. 62, 68).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on July 6, 2005 (Tr. pp. 278-310). The ALJ denied Roy's claim on March 30, 2006 (Tr. p. 253), but the ALJ's decision was vacated by the Appeals Council in June 2006 and remanded with instructions to subpoena an examining physician to the hearing, as previously requested by the claimant, and re-evaluate the claim (Tr. pp. 266, 379).

The second hearing was held before the ALJ on June 10, 2008, at which Roy appeared with his attorney, a vocational expert ("VE"), and a medical expert ("ME") (Tr. pp. 311-369). The ALJ denied Roy's claim in July 2008 (Tr. pp. 13-22), finding that,

although Roy suffers from severe impairments of "seizure disorder, osteoarthritis, history of cocaine/alcohol abuse, cognitive disorder, affective disorder, and borderline intellectual functioning," he has the residual functional capacity to do light work except that he can only occasionally climb stairs, cannot climb ladders, ropes or scaffolds, cannot run, cannot work around dangerous machinery, heights, uneven surfaces or extreme temperatures, has a limited ability to work around vibration and noises, can only understand simple instructions and concentrate and perform simple tasks and 1-2 step operations, and have a limited public/employee contact setting (Tr. p. 17). The ALJ's/Commissioner's final decision was vacated on appeal on August 31, 2009, by the U.S. District Court for the Western District of Louisiana,[1] pursuant to motion by the Commissioner of Social Security ("the Commissioner"), because the examining physician (psychologist Charles M. Robertson, Ph.D.) had ignored his subpoena and was not questioned at the hearing (Tr. pp. 379, 389).

Pursuant to the court's remand, the Appeals Council directed the ALJ to hold a third de novo hearing and obtain evidence from a medical expert (a psychiatrist), follow the applicable procedures for preparing and enforcing a subpoena, obtain updated medical records, obtain school records (including psychological testing), re-evaluate Roy's mental impairment and residual functional capacity, and obtain testimony from a vocational expert if necessary (Tr. pp. 380, 393-397).

---

[1] Roy v. Astrue, 2009 wl 2827948 (W.D.La. 2009).

2

The third hearing was held before ALJ Hertzig[2] on September 22, 2010, at which Roy appeared with his attorney (Tr. pp. 438-466).   The ALJ found that, although Roy suffers from severe impairments of epilepsy and borderline intellectual functioning (Tr. p. 382), he has the residual functional capacity to perform light work with the following limitations: no climbing ladders, ropes and scaffolds, only occasional climbing of stairs, no working around dangerous machinery, at heights, on uneven surfaces, or in extreme temperatures, limited exposure to vibration and noises, only simple instructions and simple tasks with one to two step operations, and he should have only limited public employee contact (Tr. p. 384).   The ALJ concluded that Roy was not under a disability at any time through the date of his decision on December 15, 2010 (Tr. p. 387).

Roy requested a review of the ALJ's decision, but the Appeals Council declined to review the ALJ's decision (Tr. p. 371), and the ALJ's decision became the final decision of the Commissioner.

Roy next filed this appeal for judicial review of the Commissioner's final decision.   Roy raises the following grounds for relief on appeal (Doc. 11):

> 1. The ALJ failed to issue a timely-requested subpoena and thereby denied Roy due process of law.
>
> 2. The ALJ failed, on remand, to follow the orders of the Appeals Council.  Therefore, the December 15, 2010 denial of Roy's claim is not supported by substantial evidence.
>
> 3. The ALJ failed to fully and fairly develop the facts as to borderline intellectual functioning versus mild

---

[2] Different ALJs presided at each hearing.

3

mental retardation, resulting in prejudice to Roy.

The Commissioner filed a brief in response to Roy's appeal (Doc. 12), to which Roy replied (Doc. 13). Roy's appeal is now before the court for disposition.

## Eligibility for SSI Benefits

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. § 1382(a). To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382(a)(3). The earliest month for which an eligible SSI claimant can receive benefits is the month following the month his application was filed, 20 C.F.R. § 416.335, or the month following the month during the pendency of the application that the claimant meets all the eligibility requirements, 20 C.F.R. § 416.330(a).

## Summary of Pertinent Facts

### 1. Medical Records

In March 1991, Dr. Fayez Shamieh, a neurologist, examined Mervin for a seizure disorder for the past two years and recent frequent seizures (Tr. p. 186). Roy was taking Dilantin for his seizures (Tr. p. 186). Roy reported sometimes passing out,

4

generalized shakiness all the time, and sometimes biting his tongue and wetting himself when he recovered from a seizure, as well as drowsiness, headache and generalized tiredness after a seizure (Tr. p. 186).   Roy reported having had several head injuries in the past, surgery on his head, and a gunshot wound from the neck to the jaw (Tr. p. 186).   A CT scan of Roy's brain showed evidence of a previous right frontal craniotomy and post-operative changes in the right frontal lobe, but appeared otherwise appeared normal (Tr. p. 185).

In May 1991, Dr. Shamieh ordered an electrogram which showed Roy had a mixed, slightly slow and fast pattern, but no evidence of a focal lesion of the brain (Tr. p. 182).   In August 1991, Roy's Dilantin level was low (Tr. p. 184).

In April 1992, Roy reported occasional seizures, his Dilantin level was very low, and he was advised to stop drinking alcohol and make sure he takes his Dilantin twice a day (Tr. p. 186).   Roy's continued to have no major problems, his neurological exams were normal, and Dr. Shamieh refilled his Dilantin prescription through 1997) (Tr. pp. 143-180).

In June 1997, Roy had a seizure and the emergency room found his Dilantin level was low; Roy reported having run out of Dilantin_ ten days before (Tr. p. 142).   Dr. Shamieh noted Roy's neurological exam was completely normal and continued to refill Roy's Dilantin through 1998 (Tr. p. 142).   In September 1998, Roy reported doing well and having no major problems; Dr. Shamieh found Roy's neurological exam was normal (Tr. p. 141).   IN June 2000, Roy

5

reported that he had not been having any seizures, his neurological exam was normal, and Dr. Shamieh continued to refill Roy's Dilantin prescription (Tr. p. 140). In February 2001, Roy reported he had not had any seizures, was taking Dilantin twice a day, his neurological exam was normal, and his Dilantin prescription was refilled (Tr. p. 139).

In June 2002, Roy fell in the bathroom, injuring his back and neck (Tr. p. 131). Roy was taking Dilantin to control his seizures (Tr. p. 131). X-rays showed moderate degenerative facet hypertrophic changes at L5-S1 in his lumbosacral spine, moderate to severe degenerative osteoarthritic changes at C5-C6 in his cervical spine, and moderate to severe narrowing of the right C5-C6 foramen (Tr. pp. 127-128).

In January 2003, Roy reported chest pain (Tr. pp. 123-124).

Roy was in the custody of the Harris County Sheriff in Texas in 2003 (Tr. p. 189). Roy's Dilantin prescription was refilled (Tr. pp. 189, 195-196, 202-213). In July 2003, it was noted that Roy had been seizure-free while on Dilantin (Tr. p. 213). In August 2003, Roy was noted to have dysthymia (a mood disorder) and slowed cognition (Tr. p. 207).

In October 2003, Roy reported having headaches for two days, nausea, fever, difficulty chewing with the right side of his mouth, photophobia, sound sensitivity, and blurry vision (Tr. p. 198). Roy stated he had run out of Dilantin (Tr. p. 198). Roy was diagnosed with a seizure disorder and a painful lipoma (a tumor of fatty tissue) on the right tempo-mandibular area of his face, and

6

prescribed Naprosyn and Dilantin (Tr. pp. 199-201).

A physical residual functional capacity assessment was filled out in November 2003 by Dr. Kelvin A. Samaratunga, a Texas neurologist, who found Roy cannot climb ladders, ropes or scaffolds, should avoid moderate even exposures to hazards such as machinery and heights, and noted Roy had been seizure free since August 2002 (Tr. pp. 215-222).

Another physical residual functional capacity assessment was filled out in December 2003 by Dr. S. Spoor, a Texas neurologist, who found Roy cannot climb ladders, ropes or scaffolds, should avoid moderate even exposures to hazards such as machinery and heights, and noted Roy's seizures were well-controlled and his last seizure was in June 2003 (Tr. pp. 223-230).

In June 2005, an internist filled out a form for Roy's physical ability to do work-related activities (Tr. pp. 231-234), finding Roy can lift/carry up to 20 pounds occasionally and up to ten pounds frequently, has no limitations in walking or standing, has a limitation in his upper extremities on pushing/pulling due to right shoulder pain, can frequently climb and balance, should only occasionally kneel, crouch or stoop, and should never crawl, is limited to only frequent reaching, handling, and fingering, and should have only limited exposure to temperature extremes, noise, vibration, hazards, and fumes, odors, chemicals and gases (Tr. pp. 231-234).

In December 2005, Roy had a psychological (IQ, memory, and personality) assessment by Charles M. Robertson, Ph.D., a clinical

7

psychologist (Tr. pp. 236-231). Dr. Robertson noted that Roy was 48 years old and complained of weight loss, loss of energy, loss of appetite, chronic anxiety, and loss of concentration and memory (Tr. p. 237). Roy reported he had been receiving SSI, but it was discontinued when he was incarcerated for eighteen months and never reinstated (Tr. p. 237). Roy also reported a surgical history of a craniotomy, surgical repair of a right orbit fracture, and surgical repair of a gunshot wound to his neck, and a history of a grand mal seizure disorder, with his last seizure occurring a few days ago, and that his medication had been cut off for the last three months due to Hurricane Rita (Tr. pp. 237-238). Dr. Robertson also noted Roy's trauma history of a concussion with one hour loss of consciousness at age 16, sometimes non-compliant with medication, and multiple warnings to discontinue drinking alcohol (Tr. p. 238). Roy admitted he drinks about twelve beers on the weekends, but stated he used to be intoxicated every day, and also admitted he uses marijuana sometimes and smokes about ten cigarettes a day (Tr. p. 238). Roy has blurred vision for which he uses reading glasses (Tr. p. 238). Roy also reported repeating the fourth and seventh grades, completing the tenth grade, then dropping out of school after his brain injury; he did not attend special education classes (Tr. p. 238). Dr. Robertson further noted Roy's past employment as a laborer, he last worked twelve years ago, he is single and does not have children, he lived with his parents and sister, he liked fishing and basketball, was independent in self-care and managing his finances, and could read

8

and write (Tr. p. 238).

Dr. Robertson found Roy could maintain attention and concentration, was able to follow a three stage command, he had articulation difficulty, simple drawings reflected an impaired ability to construct visual concepts, he had difficulty with writing, his mood was primarily depressed, his affect was somewhat flat, his intellect was estimated to be below average, his judgment and insight were fair, and his test results were considered to be valid (Tr. p. 239). On the Weschler Adult Intelligence Scale-III, Roy had a verbal IA score of 68, a performance IQ score of 67, and a full scale IQ Score of 65, which indicates he is in the mild range of mental retardation, at the first percentile (Tr. p. 239). Roy's scores on the Weschler Memory Scale-III produced a general memory index of 74 in the borderline range of ability, at the fourth percentile (Tr. p. 240). Roy's visual delayed memory stood out as extremely impaired, possibly due to his history of a right orbital fracture (Tr. p. 240). Roy also has low average range abilities in auditory and immediate memory, immediate memory overall, auditory delayed memory recognition, and delayed memory and working memory (Tr. p. 240). Roy's responses to the MMPI-2 resulted in an invalid profile due to exaggeration in the response set (Tr. p. 240).

Dr. Robertson concluded that Roy's intellectual functioning is in the mild range of mental retardation with corresponding deficits in memory, he has a marked impairment in visual delayed memory consistent with his prior traumatic brain injury, and he has a

seizure disorder and is non-compliant with medication (Tr. p. 240). Dr. Robertson noted that Roy was currently off his medication, drinking alcohol, and using cannabis (Tr. p. 240). Dr. Robertson stated that Roy might make an appropriate candidate for vocational rehabilitation if he can attain sobriety and maintain it for at least one year, which might also have the effect of improving his memory problems; however options available for vocational rehabilitation are severely limited by his intellectual and memory impairments, and even with sobriety his vocational potential might be limited to supervised employment (Tr. p. 240).

Dr. Robertson diagnosed alcohol dependence, cannabis abuse and cognitive disorder associated with traumatic brain injury at Axis I, mild range of mental retardation at Axis II, seizure disorder at Axis III, severe recent stress from discharge from incarceration at Axis IV, and at Axis V his GAF was 55, both present and in the past year (Tr. p. 241).[3]

---

[3] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR"). GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness. The first

In July 2008, Roy underwent another psychological evaluation with psychologist Jerry L. Whiteman, Ph.D., who administered an IQ test, did a mental status exam, and reviewed Dr. Robertson's report (Tr. p. 275). Dr. Whiteman found Roy had a significant speech impediment which he attributed to having been shot in the neck and jaw, but which did not preclude him from adequately communicating with others (Tr. p. 273). Dr. Whiteman noted Roy's report that he is 5'7" tall and weighs 150 pounds (Tr. p. 273), he has a variable appetite and weight and a fair sleep cycle, and he relies on his brother for transportation, but drives short distances such as going to the store, even though he is not licensed (Tr. p. 273). Roy reported a head injury that required surgery after being struck in the head with a football helmet when he was sixteen years old, severe injuries to his mouth when he was shot in the neck at nineteen years old, and an eye injury caused by an assault when he was twenty-one years old (Tr. p. 273). Roy was also treated for alcohol abuse about twelve years ago (Tr. p. 273). Roy complained of a crooked back which results in pain and stiffness with occasional difficulty walking (Tr. p. 274). Roy maintains daily hygiene but has no upper teeth, and he handles household chores such as washing dishes, laundry and vacuuming but cannot lift heavy objects (Tr. p. 274). Roy reported a tenth grade education, having

---

number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year. DSM-IV-TR at 32-34. The GAF scale goes from 0-100: 51-60 is moderate symptoms OR moderate difficulty in social, occupational, or school functioning. DSM-IV-TR, at 34. Also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

repeated the fourth, seventh, and ninth grades (Tr. p. 274). Roy also reported taking Dilantin and medicine for high blood pressure (Tr. p. 274).

Dr. Whiteman found Roy was oriented in all spheres, his short term memory and concentration skills were in the average range, his intermediate memory, the ability to retain verbal data over a brief time span, was limited, he could perform a three step task, his reading skills were limited, his general fund of information and long term memory skills were deficient, and his math skills were his greatest weakness (Tr. pp. 274-275). On the Weschler Adult Intelligence Scale-III, Roy had a verbal IQ score of 67, a performance IQ score of 63, and full scale IQ of 63, reflecting mild retardation (Tr. p. 275). Dr. Whiteman stated that Roy has deficits in all domains except short term memory, which is average, and his cognitive deficits are paralleled by deficits in his adaptive behaviors and capacity for independent functioning, which have existed throughout his lifetime (Tr. p. 275). Dr. Whiteman diagnosed drug and alcohol abuse, and cognitive disorder NOS at Axis I, and mild mental retardation at Axis II (Tr. p. 275).

Dr. Whiteman concluded that Roy's cognitive abilities and capacity for adaptive behaviors reflect mild deficits, he has a limited capacity for communication (due to his head injury and the gunshot wound to his neck and jaw) but is capable of being understood if he speaks slowly, his ability to adapt to new situations appeared to be limited, his ability to tolerate stress and control his anger are limited, his ability to make simple work

12

related decisions is adequate, but his ability to interact with the public on a sustained basis is poor, his ability to manage money is limited, his ability to carry out detailed instructions is limited, and his ability to address the tasks of daily living is adequate (Tr. p. 275).

On a form for "ability to do work-related activities (mental), Dr. Whiteman found Roy has light restrictions in his abilities to understand and remember short, simple instructions and to carry out short, simple instructions, and moderate restrictions in his abilities to understand and remember detailed instructions, carry out detailed instructions, and make judgments on simple work-related decisions (Tr. p. 277). Dr. Whiteman further found that Roy had moderate restrictions in his abilities to interact appropriately with the public, supervisors, and co-workers, in his ability to respond appropriately to work pressures in a usual work setting, and in his ability to respond appropriately to changes in a routine work setting (Tr. p. 277).

## 2. September 2010 Administrative Hearing

At the September 22, 2010 administrative hearing, Roy's attorney pointed out that the tribunal had not issued the subpoena he requested, to which the ALJ responded he did not receive the request ten days before the hearing (Tr. p. 442). Roy's attorney argues that he asked to have Dr. Robertson subpoenaed because his report indicated that Roy meets Listing 12.05 (Tr. p. 444). Roy's attorney also pointed out that Roy had begun receiving SSI at age 16, then it was discontinued when he was incarcerated and never

13

resumed when he was released from incarceration (Tr. p. 443). Roy's attorney contends that Roy's old medical records, on which his original award of SSI was based, are not in the administrative record (Tr. p. 444). Roy asked for a continuance of the hearing for issuance of the subpoena to Dr. Robertson and to complete Roy's administrative record with the old medical records on which his SSI award was based (Tr. p. 444). The ALJ denied the continuance (Tr. pp. 444-445), and stated that he intended to throw out Dr. Robertson's report because he had not complied with the subpoena (Tr. p. 457).

Roy testified that he went to the eleventh grade in school, he was 53 years old, and he had been part time (fourteen to eighteen hours per week) in a soup kitchen since 2006, helping to make the dinners and serving them (Tr. pp. 447-448). When asked by the ALJ, Roy testified that he gets to eat a meal at the soup kitchen when he works there (Tr. p. 466). His brother drives him to work (Tr. p. 452). Roy testified he was incarcerated from 2001 through 2005 for indecent exposure (Tr. pp. 449-450). Roy testified that he dropped out of school after the tenth grade because of his head injury, which started his seizures (Tr. p. 454).

Roy testified that he received SSI for his seizure disorder until he was incarcerated in 2001 (Tr. p. 452). Roy testified that he received Dilantin for his seizures while he was in prison (Tr. p. 452).

In response to questions from the ALJ, Roy testified that he drinks two or three beers on the weekend now, but does not drink

14

every day; he used to drink a twelve pack of beer a week before he went to prison in 2001 (Tr. p. 453). In response to further questions by the ALJ, Roy responded that he drank Budweiser in twelve ounce cans (Tr. pp. 453-454). The ALJ also questioned Roy about who had filled out and signed his SSA forms, which had responses printed in pencil and Roy's signature was printed in pencil; Roy testified that he had filled them out and signed them (Tr. pp. 454-455).

In response to questions by his attorney, Roy testified that he received SSI in the 1980's and that he received them until he was incarcerated in 1999 (Tr. pp. 459-460). Roy testified that his mother used to receive the checks for him but he received them himself, in his name, after she passed away in 1993 (Tr. pp. 459-460). Roy testified that he did not really know why he received the checks, although he thought it was for his seizures (Tr. p. 460). Roy's attorney then asked the ALJ to provide the DDS transmittal from 1986 which identifies the impairment(s) which established the disability for which Roy began receiving SSI payments in 1986 (Tr. p. 460). At this point, the ALJ and the attorney began arguing, the ALJ threatened to expel the attorney from the hearing, and the ALJ effectively derailed any further questioning of Roy by his attorney (Tr. pp. 461-465).

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine

15

whether Roy (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Roy has no past relevant work (Tr. p. 386), and that he has The ALJ found that, although Roy suffers from severe impairments of epilepsy and borderline intellectual functioning (Tr. p. 382), but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 383).

At Step No. 5 of the sequential process, the ALJ further found

16

that Roy has the residual functional capacity to perform light work with the following limitations: no climbing ladders, ropes and scaffolds, only occasional climbing of stairs, no working around dangerous machinery, at heights, on uneven surfaces, or in extreme temperatures, limited exposure to vibration and noises, only simple instructions and simple tasks with one to two step operations, and he should have only limited public employee contact (Tr. p. 384). The ALJ found that Roy is a younger individual with a limited education and no transferable work skills (Tr. p. 386). The ALJ concluded that there are a significant number of jobs in the national economy which Roy can perform, such as housekeeper (hotel or motel) or hand packer/packager[4] and, therefore, Roy was not under a disability at any time through the date of his decision on December 15, 2010 (Tr. p. 387).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994),

---

[4] The ALJ relied on the VE's testimony from the 2008 administrative hearing to make this finding (Tr. pp. 311-370).

citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981).  Also, <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."   <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

<u>Law and Analysis</u>

<u>Ground 1 - Subpoena</u>

First, Roy contends the ALJ failed to issue a timely requested

18

subpoena and thereby denied him due process of law.

As noted by the Appeals Council in this case (Tr. p. 266), when the claimant has requested a subpoena, he has a due process right to cross-examine an examining physician. Lidy v. Sullivan, 911 F.2d 1075, 1077 (5th Cir. 1990), cert. den., 500 U.S. 959, 111 S.Ct. 2274 (1991), and cases cited therein. The Appeals Council found Roy's right to cross-examine Dr. Robertson had been violated by the previous ALJ's refusal to enforce Dr. Robertson's subpoena (Tr. p. 395), and directed ALJ Hertzig to comply with the subpoena issuance and enforcement procedures to subpoena Dr. Robertson, an examining psychologist (Tr. p. 396). There is no evidence in the administrative record that Dr. Robertson was subpoenaed. Therefore, the ALJ again violated Robertson's right to cross-examine his examining psychologist.

As discussed below, remand for another hearing is unnecessary because, as discussed below, the undersigned finds that Roy meets Listing 12.05(c).

Ground 2 - Appeals Council Orders

Next, Roy contends the ALJ failed, on remand, to follow the orders of the Appeals Council. Therefore, the December 15, 2010 denial of Roy's claim is not supported by substantial evidence.

The Appeals Council ordered the ALJ, on remand, to hold a third hearing, obtain evidence from a medical expert (a psychiatrist), follow the procedures for preparing and enforcing a subpoena, obtain updated medical records, obtain school records (including psychological testing), re-evaluate Roy's mental

19

impairment and residual functional capacity, and obtain testimony from a vocational expert if necessary (Tr. pp. 380, 393-397).

In the case at bar, ALJ Hertzig rebuked Roy's attorney for not providing him with a subpoena earlier than he did and for not providing Roy's school records. There is nothing in the record which indicates the subpoena was sent out or that the previously issued subpoena was enforced. Moreover, the ALJ did not obtain a psychiatrist to clarify the nature and severity of Roy's impairment, did not employ a vocational expert (instead he relied on the VE's testimony at the 2008 hearing), and did not conduct a proper hearing, since he did not attempt to investigate any relevant issues at the hearing, and effectively precluded Roy's attorney from doing so. The Commissioner's brief admits the ALJ did not issue a subpoena for Dr. Robertson, did not obtain a consultative exam by a psychiatrist, and did not call either a medical expert or a vocational expert at the hearing. The ALJ clearly failed to comply with the Appeals Council's directives and the "hearing" he held was wholly inadequate.[5]

---

[5] It is also noted that the ALJ failed to hold a de novo hearing; instead, he relied on the VE's testimony and the medical expert's testimony in the 2008 hearing. A simple definition of a de novo hearing is "[A] hearing of a matter, conducted as if the original hearing had not taken place." Black's Law Dictionary (7th ed. 1999). Therefore, there is a problem when an ALJ incorporates testimony from a previous hearing. See Mallough v. Astrue, 2009 wl 982795 (W.D.Pa. 2009)("'de novo determination' means 'an independent determination of a controversy that accords no deference to any prior resolution of the same controversy'); Barrientos v. Barnhart, 2003 wl 22844253 (N.D. Ill. 2003)("there are two problems with the ALJ's approach: 1) incorporating the prior vacated decision into the new decision; and 2) relying upon VE testimony from a previous hearing, which was no longer part of the record"); Lancaster v. Sullivan, 1992 wl 193557, *5 n.3

However, a remand for a fourth hearing is not warranted because, as discussed below, there is adequate evidence in the record to find Roy meets Listing 12.05(c).

Ground 3 - Intellectual Functioning

Roy contends the ALJ failed to fully and fairly develop the facts as to borderline intellectual functioning versus mild mental retardation, resulting in prejudice to Roy.

Although, as discussed above, ALJ Hertzig failed in his duty to comply with the Appeals Council's instructions and develop the medical evidence in this case, it does not appear that Roy was prejudiced by those failures because there is adequate evidence in the record to conclude that Roy meets Listing 12.05(c).

Listing 12.05(C) states:

"Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
"The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
          *          *          *
"C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

The level of severity under Listing 12.05(c) is met when a claimant proffers a valid verbal, performance, or full scale IQ of 60 through 70 and suffers from an impairment that imposes an additional and significant work-related limitation of function

---

(N.D.Ill. 1992) ("A de novo hearing is a hearing on a new evidentiary record that is unfettered by any prejudice from the prior proceedings").

which more than minimally or slightly effects the claimant's ability to do basic work. <u>Wilbon v. Commissioner of Social Security</u>, 181 Fed. Appx. 826 (11th Cir. 2006), citing <u>Edwards v. Heckler</u>, 755 F.2d 1513, 1515 (11th Cir. 1985). Listing 12.00A states:

> For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in the §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of functions," even if you are unable to do your past work because of the unique features of that work. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A (2011).

The Federal Register sets out the motivation behind changing regulation 12.05(c) in 2000, at 65 Fed.Reg. 50746, 50772-73 (August 21, 2000), as follows:

> We always have intended the phrase to mean that the other impairment is a "severe" impairment, as defined in §§ 404.1520(c) and 416.920(c). We have explained this policy previously in our training manuals, in Social Security Ruling 98-1p, and in Social Security Acquiescence Ruling (AR) 98-2(8). Therefore, [ ] we revised the fourth paragraph of final 12.00A, which explains how we assess the functional limitations of an additional impairment under listing 12.05C. The revised paragraph states that we will assess the degree of functional limitation the additional impairment imposes to determine if it significantly limits an individual's physical or mental ability to do basic work activities; "i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)."

> Sections 404.1520(c) and 416.920(c) note that we must base our assessment of whether an impairment is severe on the limitations that the impairment imposes on the individual's physical and mental abilities to do basic work activities. When we do this, we do not consider factors such as the individual's age, education, or past

work experience. Thus, although the other impairment in listing 12.05C may not prevent the individual from doing his or her past work, it may still cause an "additional and significant work-related limitation of function." Conversely, if the other impairment prevents the individual from doing his or her past work because of the unique features of that work, but does not significantly limit the individual's ability to do basic work activities, we will find that the impairment does not satisfy the "additional and significant work-related limitation of function" requirement in listing 12.05C.

Tyree v. Astrue, 2012 WL 345362, *3 (S.D.Ala. 2012).

The Regulations define a *non*-severe impairment as an impairment or combination of impairments that do not significantly limit a claimant's physical or mental ability to do basic work activities. "Basic work activities" are physical functions such as walking, standing, sitting lifting, pushing, pulling, reaching, carrying or handling, capacities for seeing, hearing, and speaking, understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521, 20 C.F.R. § 416.921.

Roy's IQ meets the requirements of Listing 12.05C. Dr. Robertson measured Roy's full scale IQ at 65, while Dr. Whiteman measured his full scale IQ at 63. Dr. Whiteman indicated that Roy has had an intellectual deficit his entire life (Tr. p. 275).

Roy has an additional cognitive impairment which was diagnosed by both Dr. Robertson and Dr. Whitehead. Dr. Robertson stated that Roy's delayed visual memory has a significant, marked impairment, possibly from his right orbital fracture causing a right hemisphere injury and/or from his traumatic brain injury when he was sixteen

23

years old.  Dr. Robertson stated that Roy's options for vocational rehabilitation are severely limited by his intellectual and memory impairments, and that he might be limited to supervised employment.

Dr. Whiteman diagnosed Roy with a cognitive disorder in addition to mental retardation, and found he has memory problems and adaptive deficits as well as his limited intellectual functioning.  Dr. Whiteman found Roy's ability to work was affected through moderate restrictions in his abilities to understand and remember detailed instructions, carry out detailed instructions, and make judgments on simple work-related decisions, and moderate restrictions in his abilities to interact appropriately with the public, supervisors, and co-workers, in his ability to respond appropriately to work pressures in a usual work setting, and in his ability to respond appropriately to changes in a routine work setting.  Dr. Whiteman also found Roy's ability to interact with the public on a sustained basis is poor.

Roy also has an additional physical impairment which imposes a significant work-related limitation of function.  Dr. Robertson noted that Roy has articulation difficulty, though he is able to communicate effectively without difficulty.  Dr. Whiteman found that Roy has a limited capacity for communication (due to his head injury and the gunshot wound to his neck and jaw) but is capable of being understood if he speaks slowly.

Finally, Roy argues that he has a seizure disorder, also. Although Roy obviously has a seizure disorder, it appears to be well-controlled by Dilantin.  Therefore, Roy's seizure disorder

24

does not impose a significant limitation on his ability to do basic work activities.

It is clear that Roy's severe cognitive and physical impairments in addition to his mental retardation meet Listing 12.05(c). Therefore, Roy is entitled to an award of social security SSI benefits.[6]

Finally, it is noted that ALJ Hertzig relied on the testimony of Dr. Borda, a neuropsychologist (Tr. p. 340), to find Roy does not meet Listing 12.05. Dr. Borda testified at the April 2008 administrative hearing as a medical expert (Tr. pp. 332-350). Dr. Borda stated he had reviewed the medical evidence to that date, but admitted he had never examined Roy, stated he believed Roy's IQ test results were "a few points lower than they should be" and suggested Roy "should be considered to be functioning in the borderline range of intellectual functioning" (Tr. p. 333). On that basis, Dr. Borda stated that Roy did not meet any of the listings, including Listing 12.05. Dr. Borda was able to review Dr. Robertson's 2005 psychological testing and examination of Roy,

---

[6] Courts direct the Commissioner to award benefits without further rehearing when uncontroverted evidence clearly establishes that claimants are entitled to relief, or when additional fact-finding will serve no useful purpose. See Salazar v. Barnhart, 468 F.3d 615, 626 (10th Cir.2006) (remand awarding benefits is appropriate when "given the available evidence, remand for additional fact-finding would [not] serve [any] useful purpose but would merely delay the receipt of benefits"); McQueen v. Apfel, 168 F.3d 152 (5th Cir.1999) (remand awarding benefits is proper where the ALJ applied the incorrect age in applying a statutory standard, and application of the proper age would have resulted in an award of benefits); Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir.1993) (holding that an award of benefits is appropriate only when all factual issues have been resolved and "the record can yield but one supportable conclusion").

but did not have Dr. Whiteman's July 2008 psychological examination of Roy. Given that Dr. Whiteman's IQ test confirmed that Roy is mildly mentally retarded and refutes Dr. Borda's *supposition* that Roy's IQ is higher than Dr. Robertson's IQ test results indicated, and given the fact that Dr. Borda never examined Roy,[7] the ALJ very clearly erred in relying on Dr. Borda's testimony and conclusions.

This case should be remanded for a calculation of benefits only. Since Roy has been incarcerated intermittently though out his life, and is not entitled to benefits during periods of incarceration, the date on which Roy's benefits should begin, and the amount of benefits to which he is entitled, are not clear to the court, and are best determined by the Social Security Administration.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Roy's appeal be GRANTED, the final decision of the Commissioner be VACATED, and Roy be AWARDED SOCIAL SECURITY SSI BENEFITS.

IT IS FURTHER RECOMMENDED that Roy's case be REMANDED to the Commissioner for CALCULATION OF BENEFITS ONLY.

---

[7] The opinion of a treating physician deserves to be given greater weight than that of a non-treating or consulting physician. Carry v. Heckler, 750 F.2d 479, 484 (5th Cir. 1985). The treating physician's opinion is entitled to more weight than that of a consulting physician who has never examined the applicant. Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981); Warncke v. Harris, 619 F.2d 412, 416 (5th Cir. 1980); Strickland v. Harris, 615 F.2d 1103, 1109-1110 (5th Cir. 1980). An acceptable medical opinion as to disability must be supported by clinical or laboratory findings. Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981).

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 18th day of May 2012.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE